

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-18-1999

# Hurley v. Atl Cty Pol Dept

Precedential or Non-Precedential:

Docket 96-5633,96-5661

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Hurley v. Atl Cty Pol Dept" (1999). *1999 Decisions.* Paper 66.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/66

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 18, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-5633, 96-5634, 96-5661, 96-5738

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
husband and wife,

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50
inclusive, fictitious name defendants, jointly,
severally, and in the alternative

(Camden New Jersey District Civil No. 93-260)

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
wife and husband

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, jointly, severally, and in the alternative

(Camden, New Jersey District Civil No. 94-1122)

Atlantic City Police Department,
        Appellant No. 96-5633

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
husband and wife,

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, fictitious name defendants, jointly,
severally, and in the alternative

(Camden New Jersey District Civil No. 93-260)

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
wife and husband

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, jointly, severally, and in the alternative

(Camden, New Jersey District Civil No. 94-1122)

Henry Madamba,
        Appellant No. 96-5634

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
husband and wife,

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, fictitious name defendants, jointly,
severally, and in the alternative

(Camden New Jersey District Civil No. 93-260)

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
wife and husband

v.

2

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, jointly, severally, and in the alternative

(Camden New Jersey District Civil No. 94-1122)

Donna M. Hurley, and Patrick K. Hurley,
       Appellants No. 96-5661

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
husband and wife,

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, fictitious name defendants, jointly,
severally, and in the alternative

(Camden New Jersey District Civil No. 93-260)

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
wife and husband

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, jointly, severally, and in the alternative

(Camden, New Jersey District Civil No. 94-1122)

Donna M. Hurley, and Patrick K. Hurley,
       Appellants No. 96-5738

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 93-cv-00260, 94-cv-01122)

3

Argued May 4, 1998
Reargued October 5, 1998

BEFORE: BECKER, Chief Judge, SCIRICA and COWEN,
Circuit Judges

(Filed March 18, 1999)

        Clifford L. Van Syoc, Esq. (Argued)
        Van Syoc Law Offices
        200 Lake Drive East, Suite 110
        Woodland Falls Park
        Cherry Hill, New Jersey 08002

         Counsel for Plaintiffs-Appellees/
         Cross-Appellants

        Dennis M. Tuohy, Esq. (Argued)
        Tuohy & Tuohy
        20 South Tennessee Avenue
        Atlantic City, New Jersey 08401

         Counsel for Defendant-Appellant/
         Cross-Appellee, Atlantic City Police
         Department

        Mark Falk, Esq. (Argued)
        Barry & McMoran
        One Newark Center, 18th Floor
        Newark, New Jersey 07102

         Counsel for Defendant-Appellant/
         Cross-Appellee, Henry Madamba

        Richard L. Goldstein, Esq. (Argued)
        Marshall, Dennehey, Warner,
         Coleman & Goggin
        Three Greentree Center, Suite 304
        Marlton, New Jersey 08053-3405

         Counsel for Defendant/Cross-
         Appellee, Nicholas V. Rifice

Thomas F. Bradley, Esq. (Argued)
Hankin, Sandson & Sandman
30 South New York Avenue
Atlantic City, New Jersey 08401

Counsel for Defendant/Cross-
Appellee, John J. Mooney

OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal by defendants Henry Madamba and the
Atlantic City Police Department (ACPD) from an amended
judgment entered upon a jury's determination that
Madamba discriminated against plaintiff Donna Hurley on
the basis of her sex in violation of the New Jersey Law
Against Discrimination (LAD), N.J. Stat. Ann. 10:5-1 et
seq., and that the ACPD discriminated against her on the
basis of her sex in violation of the LAD and Title VII of the
Civil Rights Act of 1964 (Title VII), 42 U.S.C.S 2000e et seq.
Donna Hurley cross-appeals from an amended judgment
entered upon the jury's determination that defendant
Nicholas Rifice did not discriminate against her in violation
of the LAD. She also cross-appeals from the district court's
order granting defendant John Mooney's motion for
summary judgment and the district court's order denying
her motions for prejudgment interest and an additur and
granting her motion for attorney's fees subject to a reduced
hourly rate. In addition, plaintiff Patrick Hurley appeals
from the district court's order granting defendants' motion
for summary judgment on his loss of consortium claim.

Because the harassing conduct tolerated by the ACPD
was longstanding and egregious, and because the trial
court did not commit reversible error in its evidentiary
decisions or its jury instructions, we will affirm the
amended judgment insofar as it imposes liability and
compensatory damages on the ACPD. However, because the
punitive damages instructions did not require actual
participation by upper management or willful indifference
as required by New Jersey law, we will vacate the amended

5

judgment to the extent it imposes punitive damages against the ACPD and order a new trial on that issue.

Our recent decision in Failla v. City of Passaic, 146 F.3d 149 (3d Cir. 1998), set forth our understanding of liability for aiding and abetting under the New Jersey LAD. In light of Failla, it is evident that the jury instructions on aiding and abetting erred in two critical respects. We will therefore reverse the amended judgment entered against Madamba because the instructions failed to require a finding that Madamba substantially assisted the harassment. We will also vacate the judgment entered in favor of Rifice because the instructions wrongly directed the jury to absolve Rifice unless he took affirmative harassing acts. However, we will affirm the district court's order granting Mooney's motion for summary judgment because, as we understand New Jersey law, he could not, as a nonsupervisory employee, be liable for aiding and abetting the ACPD's failure to prevent and redress harassment even if he affirmatively harassed Donna Hurley. We will also affirm the district court's order denying plaintiff's motions for prejudgment interest and an additur and granting plaintiff's motion for attorney's fees subject to a reduced hourly rate.1

I. Facts and Procedural History2

Plaintiff Donna Hurley has been an officer with the ACPD since February of 1978. She joined the force shortly after becoming the first female graduate of the Atlantic City Police Academy. Her husband, plaintiff Patrick Hurley, is also an officer with the ACPD. For purposes of clarity, we will refer to Donna Hurley as "Hurley," to Patrick Hurley as "Mr. Hurley," and to Mrs. and Mr. Hurley collectively as the "Hurleys" or "plaintiffs." The Hurleys met while training at the Police Academy and married in 1980. Hurley alleges that she was subjected to sexual harassment as early as her training at the Police Academy in the late 1970s. In 1981 her then-supervisor, Sergeant Walter Reay, harassed

_____

1. The district court had jurisdiction over this case pursuant to 28 U.S.C. SS 1331, 1343, and 1367. We have jurisdiction over this appeal pursuant to 28 U.S.C. S 1291.

2. The facts recited were all adduced at trial.

6

her by making sexually derogatory comments about her hygiene during roll call, disturbed her while she was changing in the drill room, spoke to her in condescending tones during radio transmissions, and held her to stricter standards than male officers. During that year, fellow officers allegedly referred to Hurley as "the cunt" and placed a tampon and a copy of Hustler magazine in her squad car.

Despite these and other obstacles,[3] Hurley was promoted in November of 1987 and became the first female sergeant at the ACPD. Although her title changed as a result of this promotion, Hurley claims that her assignments continued to be menial and provided no useful experience. At one point, for example, Hurley was assigned to the Juvenile Truancy Task Force, where her job was to keep statistics on juvenile truants and where, although a sergeant, she supervised no one.

The ACPD divides its officers into three shifts: 8:00 a.m. to 4:00 p.m., or "Alpha Platoon"; 4:00 p.m. to 12:00 midnight, or "Bravo Platoon"; and midnight to 8:00 a.m., or "Charlie Platoon." After working approximately two years as a sergeant on Alpha Platoon, Hurley was transferred in January 1990 to desk sergeant of Charlie Platoon, where she came under the direct command of defendant Captain Henry Madamba. The events at the core of this case occurred while Hurley worked in Charlie Platoon. During her first week on this assignment, Madamba allegedly told plaintiff that upper management sent a woman to his unit to "break his balls," and that he "did not expect [her] to be here on this shift very long." App. at 2749–50. Madamba also allegedly advised Hurley to request a hardship transfer

_____

3. In addition to the harassment, Hurley testified that, prior to January of 1987, she was given "lowly positions that offered no useful experience or potential for advancement." Hurley v. Atlantic City Police Dep't, 933 F. Supp. 396, 405 (D.N.J. 1996). For example, she testified that she was assigned to the Records Bureau to perform menial copying tasks. See App. at 2420. She also testified that she was assigned to security desk duty, which consisted of signing civilians in and out of the department building, and fire watch, which consisted of watching one particular building for an outbreak of fire. Hurley did not, however, include a failure to train or promote claim in her complaint.

7

out of Charlie Platoon and gave a male officer with less seniority a more favorable schedule.

Hurley testified that she was sexually harassed throughout her entire tour on Charlie Platoon by her superiors and her coworkers. This harassment included "keying out" her radio transmissions,[4] demeaning comments by Madamba during roll call, and exclusion from sergeants' meetings. In addition, officers placed a sanitary napkin with sergeant's stripes over the roll call podium and affixed a dildo either to the wall or the podium in the roll call room. Finally, she was the subject of sexually explicit graffiti and drawings of herself at three locations on city property: the roll call room, the roll call bathroom, and the bathroom of the Masonic Temple, a building used by both employees and the public. Several of the most egregious examples of the offensive material, of appallingly low character, are set forth in the margin.[5]

---

4. "Keying out" or "clicking out" consists of depressing the "On" and "Off " buttons of a radio transmitter to block the communications of the officer who is using the airway.

5. Hurley was compelled to attend roll call in front of a life-size drawing of herself performing oral sex as her supervisor, Madamba, sat eight feet away. In addition, the following graffiti appeared on a wall in the roll call bathroom, which was commonly used and open to the public:

> Oh sweet Donna Hurley
> With cunt hair so curley
> Your blond hair seems so soft and stays in place
> When I toss off my cookies in your face
> I'd like to stick my cock in your ass
> But when I think of Lt. Andros my cock gets soft fast
> So keep up your spirits and don't get depressed
> Cause even though your a cunt I'd like to press yourflesh
> Though in uniform your rude and brass
> Your just another sex machine with my cock in your ass

Next to this was a graphic drawing of a naked women labeled "Donna Hurley" and bearing sergeant's stripes. Near the drawing, and apparently written by several different hands, were the scrawled phrases "just another fuck doll," "she should look this good." and "Lt. Andros was here." Lieutenant Andros was a co-worker with whom Hurley was rumored to have had an affair.

8

Hurley also testified that Madamba personally harassed her while she was on Charlie Platoon. In addition to the insults he directed at her during roll call and his decision to exclude her from sergeants' meetings, Captain Madamba allegedly refused to take action against officers who "keyed out" plaintiff 's radio transmissions, and told her that she was "too emotional" about the sanitary napkin incident. At one point, he reacted to the latest sexually explicit graffiti by rushing to see it and laughingly informing Hurley, in front of her colleagues, that "it's really bad," but he took no action to remove or prevent the appearance of the graffiti. In September of 1990, he sent a memorandum to defendant Rifice, an Inspector at the time, stating that Hurley had abused her sick leave. As a result, then-Chief of Police Robert McDuffie sent Hurley a memorandum requiring her to produce a doctor's note every time she took sick leave.

Hurley testified that when she complained to Madamba that the harassment at Charlie Platoon was becoming too much for her, he replied that women in the private sector are protected against such harassment because they "sleep with their bosses." App. at 2776-77. When she attempted to change the topic of conversation and commented on Madamba's apparent weight loss, he stated that he lost weight by "having sex a few times a day," and that women came to him "when they're ready." App. at 2498-2508. Hurley interpreted this entire conversation as a solicitation for sex.

Hurley also testified that another sergeant on Charlie Platoon, defendant John Mooney, sexually discriminated against her in two ways. First, Mooney made several sexually derogatory comments to her, some of which Madamba witnessed yet did nothing to stop. For example, Mooney remarked that he had heard that Hurley "liked it hard and stiff," and suggested that, when Hurley met with Police Captain McKenna, she was actually performing oral sex on him. See X App. at A2516, A2514. On another occasion, when Hurley was unable to locate her coffee mug, Mooney asked her if she wanted to drink out of his jock cup. See id. at A2514. Second, Mooney used his influence, which far exceeded his position as sergeant, to transfer Hurley to an undesirable assignment because of her sex.[6]
_____

6. Although Hurley and Mooney shared the same rank at that time, she alleges that

9

In particular, Hurley claims that Mooney was responsible for her transfer from her position as Court Liaison Officer to the Juvenile Truancy Task Force.

After Mr. Hurley's efforts to intervene on his wife's behalf failed, Hurley submitted a memorandum to Madamba on November 1, 1990, detailing the harassment she experienced during her tour on Charlie Platoon and requesting a transfer. Madamba forwarded Hurley's memo to the Chief of Police along with a memo of his own requesting that Internal Affairs conduct an investigation of Hurley for allegedly lying in the memo as part of a conspiracy to get money from the ACPD. No investigation along these lines was ever conducted.

Shortly thereafter, Hurley was transferred to the Alpha Platoon shift of the Property and Evidence Unit. Although she had requested a transfer out of Charlie Platoon, Hurley alleges that this particular transfer constituted retaliation for her sexual harassment memorandum because the Property and Evidence Unit was widely regarded as an undesirable position, and the Alpha Platoon was incompatible with the personal schedule to which she had become adjusted while working on Charlie Platoon. Hurley also alleges that when she was transferred to the Property and Evidence Unit, she was denied a three percent pay increase that ACPD officers receive when transferred to plain clothes duty. She eventually received this increase on April 20, 1993, retroactive to November 8, 1990. Hurley contends that the harassment continued even after she left Charlie Platoon.

_____

> Mooney had obtained power far beyond that which would otherwise be expected to be held by a mere sergeant. As a result of his years of acting as the former chief 's aid and confidant, the political prominence of his councilman father, the high position of his brother-in-law, Inspector Polk, who is married to Mooney's sister, Captain Michelle Polk, and the widespread perception in the department that Mooney was destined to become the Chief, Mooney was in a position to abuse his real authority without fear of consequences.

Appellee's Br. at 37.

10

For example, the graffiti apparently remained on the walls well after her transfer. Rifice, who had been promoted to Police Chief, testified at trial that he heard complaints about the graffiti as late as March of 1992, and Mr. Hurley took photographs of the graffiti in the summer of 1992. In addition, an EEOC investigation concluded that there was sexual graffiti in Hurley's work area as late as June of 1993. Moreover, on June 13, 1992, while Hurley was attending a police seminar, Mooney, then Captain of Charlie Platoon, allegedly approached her and called her "the ass up from the Property Room" in front of two other sergeants.

Hurley further avers that the Chief of Police, defendant Rifice, was aware of her plight and failed to take steps to protect her and discipline the perpetrators. She also testified that Rifice personally committed several affirmative acts of sexual discrimination against her. These acts included: (1) transferring her to the Property and Evidence Unit; (2) denying her access to Chief McDuffie; (3) denying her a three percent pay raise when she transferred to plainclothes duty; (4) denying her request for funeral leave; and (5) condoning an improper Internal Affairs investigation into her conduct while she was assigned to the Property Room.

Hurley worked continuously until July 26, 1994, after which she went on an extended paid sick leave. She asserts that, as a result of the harassment, she has suffered severe emotional distress that has interfered with her work, her personal life, and her family life. Mr. Hurley alleges that the harassment has detrimentally affected his relationship with his wife.

On July 10, 1992, Hurley filed complaints with both the United States Equal Employment Opportunity Commission (EEOC) and the New Jersey Department of Law and Public Safety, Division of Civil Rights (DCR). Both complaints named the ACPD as the sole respondent and alleged that Hurley had been harassed while on Charlie Platoon. Hurley submitted an affidavit in connection with her EEOC complaint alleging that Madamba and Mooney harassed her during her tour on Charlie Platoon. She claimed that obscene drawings of her remained visible as late as March

11

of 1992, and that her transfer to the Property and Evidence Unit and denial of the three percent pay raise were in retaliation for her complaints of sexual harassment.

On January 30, 1993, before the EEOC had issued plaintiff a right to sue letter pursuant to 42 U.S.C. S 2000e-(f)(1), the Hurleys filed the district court complaint which stated all of Hurley's instant claims. Subsequently, on October 12, 1993, the EEOC issued a determination on Hurley's charge. The EEOC investigator found probable cause to believe that Hurley had been sexually harassed while she was on Charlie Platoon, but no probable cause on retaliation charge regarding the transfer to the Property and Evidence Unit and the denial of the three percent pay increase. On March 7, 1994, the Hurleys filed a second complaint. This complaint relied on the facts stated in the previous complaint and alleged discrimination pursuant to 42 U.S.C. S 2000e-2 and retaliation pursuant to 42 U.S.C. S 2000e-3(a). The district court subsequently consolidated these two complaints.7

Following extensive discovery, each of the defendants moved for summary judgment. The district court granted Mooney's motion for summary judgment, and dismissed all claims against Madamba and Rifice with the exception of Hurley's aiding and abetting claims under the LAD. Additionally, the court dismissed all claims against the ACPD except for Hurley's hostile work environment claim under Title VII, Section 1983, and the LAD.

The jury trial lasted more than two months. At the conclusion of the liability portion of the trial, the jury rendered a verdict against Madamba and the ACPD but found Rifice not liable. The jury awarded $575,000 in compensatory damages and awarded punitive damages against the ACPD but not against Madamba. A punitive damage hearing was conducted before the jury, at the end of which the jury awarded Hurley $700,000 in punitive damages.

The ACPD and Madamba moved for judgment as a matter

_____

7. We note that the Hurleys' retaliation claims, arising from the ACPD's acts after this lawsuit was filed, are not part of this appeal.

12

of law or, in the alternative, a new trial or a remittitur.
Hurley moved for a new trial as to Rifice, and an additur
with respect to the entire damages award. In addition,
Rifice and Mooney, as well as Hurley, moved for attorneys'
fees and costs.

The district court denied defendants' motion for a new
trial and for a remittitur as to punitive damages and also
denied plaintiff's motion for an additur. However, the court
granted defendants' motions for a remittitur with respect to
the compensatory damages award, which the court remitted
to $175,000. The court also denied the defendants' fee
petitions, but granted plaintiff's petition, subject to a
reduced hourly rate and the exclusion of hours spent in
pursuit of unsuccessful claims. Hurley accepted the
remittitur, and the court awarded counsel fees and costs in
favor of Hurley in the amount of $516,046 and $70,135,
respectively. The court then entered an amended judgment.
This appeal and cross-appeals followed.

II. The ACPD's Liability

The ACPD argues that it is entitled to a new trial for five
reasons. First, it contends that the district court abused its
discretion under Rule 403 of the Federal Rules of Evidence
by admitting "highly inflammatory and largely irrelevant
evidence regarding alleged misconduct at the ACPD to
which the plaintiff was not exposed." ACPD's Br. at 2.
Second, it contends that the district court's ruling that
plaintiff's psychiatric expert could testify about a second
diagnosis that was not contained in his reports "result[ed]
in prejudicial surprise `inconsistent with substantial
justice.' " Id. at 40 (quoting Conway v. Chemical Leaman
Tank Lines, Inc., 687 F.2d 108, 111-12 (5th Cir. 1982)).
Third, the ACPD asserts that the punitive damage award of
$700,000 against it is so excessive that it creates an
inference that the jury's liability verdict "resulted from its
passion and prejudice toward the City of Atlantic City." Id.
at 46 (citing Dunn v. HOVIC, 1 F.3d 1371, 1382 (3d Cir.) (en
banc), modified on other grounds, 13 F.3d 58 (3d Cir.
1993)). Fourth, the ACPD claims that the district court's
jury charge under the LAD was misleading, confusing, and
contrary to the law. Finally, on reargument, which we held

13

in the wake of the recently decided Supreme Court cases of
Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.
Ct. 2257 (1998), and Faragher v. City of Boca Raton, 524
U.S. 775, 118 S. Ct. 2275 (1998), the ACPD submits that
these cases entitle it to a new trial on liability. We will
address these arguments in turn.

A. Evidence Not Obviously Linked to Hurley's Experience in
        Charlie Platoon

During trial, and over defendants' objections, the district
court permitted a number of witnesses to testify about
alleged incidents of harassment and retaliation that were
either remote in time from the "accrual date"8 or involved
matters of which Hurley was unaware until after shefiled
suit. This testimony can be divided into three categories: (1)
testimony by four women who were associated with the
ACPD about incidents of sexual harassment and retaliation
of which Hurley had no knowledge until after commencing
suit; (2) testimony by eight male police officers about
"locker-room" conversations between men outside the
presence of women; and (3) testimony by Patrick and
Donna Hurley about several incidents of sexual harassment
against Mrs. Hurley between 1978 and 1981.

The ACPD raises several arguments to support its
contention that the district court abused its discretion by
admitting this testimony. First, the ACPD points out that
Hurley was unaware of most of these comments until after
she filed suit. Thus, the comments could not possibly

_____

8. In its August 4, 1995 opinion and order, the district court concluded
that the claims that formed the basis of plaintiff 's sexual
discrimination
allegations began in late 1989 or early 1990, upon plaintiff 's transfer
to
Charlie Platoon. App. at 5752. However, at the beginning of trial, the
court expanded the time frame from which plaintiff could assert claims
of sexual discrimination to January 20, 1987, based upon the court's
conclusion that such claims would have been within the six-year statute
of limitations that the court found applicable to claims under the LAD.
In Montells v. Haynes, 627 A.2d 654, 659 (N.J. 1993), the New Jersey
Supreme Court adopted a two-year statute of limitations for claims
under the LAD. However, the Montells court also held that its decision
did not apply to cases pending at that time or to cases in which the
operative facts arose before the date of the court's decision, see id. at
662, circumstances present here.

14

contribute to a hostile work environment for her. Second, it argues that it was impossible to rebut most of the alleged incidents at trial because they occurred at unspecified times and locations. Third, the ACPD asserts that incidents from 1978 to 1981 were too remote in time to be probative. Finally, the ACPD maintains that the district court's limiting instructions regarding this evidence were insufficient to offset the unfair prejudice resulting from these rulings.

1. The Challenged Evidence

The district court permitted four women who had been associated with the ACPD to testify regarding the harassment of women within the department. Hurley did not witness any of these incidents, nor did she become aware of the alleged harassment until after she commenced suit.

Martha Donovan, a municipal prosecutor for the City of Atlantic City, testified about some mistreatment of Hurley that she had observed and also testified about an incident involving Sergeant Edward Yard of the ACPD. According to Ms. Donovan's testimony, in the summer of 1989 Sergeant Yard called Ms. Donovan a "cunt" and stated that he "ought to slap [her] face" for giving him an order; the incident occurred in front of fifty other people, including other police officers, in the hallway of the courthouse. See IV App. at A831. Donovan immediately complained to her supervisor and the officer ultimately apologized. At some point thereafter, Sergeant Yard's responsibilities were changed, and he had minimal contacts with Ms. Donovan thenceforth. Ms. Donovan never reported the incident to the ACPD supervisory staff.

Julia Cardy and Lisa O'Keefe, two civilian employees of the ACPD in the payroll department, testified that they were generally dissatisfied with their male ACPD supervisors. Ms. Cardy testified that in 1992, as a result of reporting her supervisor, Sergeant Griggs, to his immediate supervisor, Captain MacDonald, for his misbehavior, she was retaliated against and subjected to chauvinistic remarks. Ms. Cardy further testified that women were treated "pretty poorly" if they "spoke out" against the mistreatment. V App. at

15

A1166, A1171. Ms. O'Keefe stated that Sergeant Griggs and Captain MacDonald treated her with disrespect over a long period of time extending to at least 1992, when there was apparently some ill-feeling towards female employees as a result of Hurley's lawsuit. See IV App. at A858-60. She also testified that complaints to Rifice received no response, see id. at A862, although she ultimately filed a union grievance and the offending officers were removed from authority over the payroll department.

Officer Deborah Rando of the ACPD testified about the derogatory and sexually demeaning statements made to her in 1992 by her supervisor, defendant Mooney. At one point, Mooney referred to her conduct in profane terms and, when she objected, informed her that no one would believe her if she complained. See id. at A943. Despite this, she did complain to Mooney's supervisor, who warned her to think about her career and told her not to repeat her allegations to anyone. See id. at A948-50.

The district court permitted eight male police officers from the ACPD to testify at trial about derogatory comments made about women generally. These officers testified that, at least from 1990 to the time of trial, women were commonly referred to as "cunts," "douche bags," "broads," "bitches," and, as a group, "the crack troop." App. at A413, A768. In addition, one officer testified that most inspectors and captains commonly referred to Hurley as "the whacky [sic] cunt." Id. at 443. These same officers testified, however, that these comments were always made outside the presence of women. Hurley was unaware of these comments until after she commenced suit.

Finally, the district court permitted both Patrick and Donna Hurley to testify, over objection, about events occurring well before the January 20, 1987 accrual date. For example, Mr. Hurley testified about alleged acts of discrimination against his wife dating back to her tenure at the Police Academy in 1978. He also testified about comments allegedly made by Hurley's supervisor, Sergeant Walter Reay, between 1978 and 1980. Reay supposedly asked Hurley about her personal hygiene and made weekly comments during roll call.

16

Hurley also testified about various incidents that allegedly occurred in 1981, when she was a patrol officer and Louis Rivera was her partner. Hurley testified that she "heard" that she was referred to as a "cunt." Id. at 2388-90. The court also permitted her to testify that, during 1981, a Hustler magazine was left on her patrol car seat and a tampon was hung from her rear view mirror.

2. Admissibility of the Evidence

In the district court's view, all of the evidence was admitted for the same purpose: to "permit[ ] the jury to more intelligently evaluate the evidence that did create liability." Hurley, 933 F. Supp. at 411. The court reasoned that permitting

> evidence of other women's experiences at the ACPD, of the attitudes of male officers towards women generally, and of Hurley's experiences prior to 1987 served several important purposes in this trial. It allowed the jury to gain insight into the motives, attitudes, and intentions of the defendants. It gave them the opportunity to evaluate the adequacy of management's response to Hurley's complaints during the statutory period. It provided the jury with a sense of whether the events that took place during the statutory period were anomalous or accidental, or instead were part of a "pervasive and severe" pattern.

> Plaintiff's treatment during the statutory period was unquestionably influenced by and related to her treatment throughout the course of her career at the ACPD. Plaintiff's experience was reflective of the general attitudes of the men around her; those attitudes also influenced, and were revealed in, the treatment of other women in the ACPD.

Id.

Although the district court believed that evidence of past harassment was "crucial to the jury's evaluation of the work environment at the ACPD," id. at 410, the court instructed the jury not to consider the evidence directly for purposes of liability. See id. at 411. Specifically, the court stated:

17

> You are to consider whether each defendant has
> engaged in sexual discrimination for the period from
> January 20, 1987, through January 20, 1993. You
> may consider evidence from before and after these
> dates to help you evaluate the defendants' conduct
> from January 20, 1987, through January 20, 1993,
> but liability attaches, if at all, only to defendants'
> conduct during this period.

Id. (alteration removed). The court believed that, "[b]y admitting the evidence but forbidding the jury to consider it as directly relating to liability, [it was] able to balance the interests of the plaintiff and the defendants." Id. In addition, the court instructed the jury that, in determining whether or not a hostile work environment existed, it could only consider conduct that actually altered Hurley's own work environment during the relevant period. See App. at A5278.

The evidence issues fall largely within the ambit of Federal Rule of Evidence 401, which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."[9] Rule 401 does not raise a high standard. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 782–83 (3d Cir. 1994). Also implicated in our discussion is Rule 403, which provides, in pertinent part,

_____

9. The parties have not argued that we need apply New Jersey procedure to the New Jersey claims, and we will apply the federal rules to both. See Purgess v. Sharrock, 33 F.3d 134, 139–40 (2d Cir. 1994); cf. Wm. T. Thompson Co. v. General Nutrition Corp., Inc., 671 F.2d 100, 104 (3d Cir. 1982) (holding that the federal rule favoring admissibility of relevant evidence applies to state law claims in federal cases to which state law privileges might otherwise apply); Salas by Salas v. Wang, 846 F.2d 897, 905–06 (3d Cir. 1988) (discussing the standard for applying state evidentiary rules in pure diversity cases). Nor is there any indication that
New Jersey admissibility rules differ in any relevant respect, as we think New Jersey's law recognizes the same principles we discuss in text. See Rendine v. Pantzer, 648 A.2d 223, 237–38 (N.J. Super. Ct. App. Div. 1994) (discussing the admissibility of evidence of discrimination against other people to prove motive or intent under N.J.R.E. 404(b)), aff 'd in relevant part, 661 A.2d 1202, 1213 (N.J. 1995).

18

that "[relevant] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." We review evidentiary rulings for abuse of discretion, see Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 132 (3d Cir. 1997), with substantial deference under Rule 403.[10] We conclude that the district court did not abuse its discretion under Rules 401 or 403 by admitting most of the challenged evidence, and that the error with respect to a portion thereof was harmless.

Evidence that women other than the plaintiff were subjected to a hostile work environment clearly meets Rule 401's requirements in a number of situations. For example, a plaintiff may show that, while she was not personally subjected to harassing conduct, her working conditions were nevertheless altered as a result of witnessing a defendant's hostility towards other women at the workplace. See Lehmann, 626 A.2d at 457 ("A woman's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers.").

A plaintiff's knowledge of harassment or pervasively sexist attitudes is not, however, a requirement for admitting testimony on those subjects in a harassment suit. Evidence of harassment of other women and widespread sexism is also probative of "whether one of the principal non-discriminatory reasons asserted by [an employer] for its actions was in fact a pretext for . . . discrimination." Glass v. Philadelphia Elec. Corp., 34 F.3d 188, 194 (3d Cir. 1994); see also Heyne v. Caruso, 69 F.3d 1475, 1480 (9th Cir. 1995). In Glass, we found reversible error where the plaintiff attempted to introduce evidence of past racial harassment to explain negative evaluations and the trial court excluded it because it was time-barred. Glass relied

_____

10. We have held that a trial judge is given very substantial discretion when striking a Rule 403 balance, see United States v. Eufrasio, 935 F.2d 553, 572 (3d Cir. 1991), and that "a trial judge's decision to admit or exclude evidence under Fed. R. Evid. 403 may not be reversed unless it is arbitrary and irrational." Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 187 (3d Cir. 1990) (quotation marks omitted).

19

on Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988), adopting its holding that circumstantial proof of discrimination, including evidence of past harassment and evidence of discrimination against others in the protected class, is admissible. Moreover, in Rule 403 terms, this evidence is highly probative, hence it is unlikely that any putative prejudice therefrom will be unfair or will outweigh its value.[11]

The principles established by our precedent apply to this case. Evidence of other acts of harassment is extremely probative as to whether the harassment was sexually discriminatory and whether the ACPD knew or should have known that sexual harassment was occurring despite the formal existence of an anti-harassment policy. See West v. Philadelphia Elec. Co., 45 F.3d 744, 752 (3d Cir. 1995). Neither of these questions depends on the plaintiff 's knowledge of incidents; instead, they go to the motive behind the harassment, which may help the jury interpret otherwise ambiguous acts, and to the employer's liability. This kind of evidence is particularly important given the ACPD's main defenses at trial, which were that the incidents of abuse Hurley suffered were trivial horseplay to which both men and women were subjected and that its written sexual harassment policy was sufficient to insulate it from liability. Contrary to the ACPD's position, it is implausible in the extreme that Hurley was somehow immune from the pervasive sexism at the ACPD, as it was described by both female and male officers. See Hurley, 933 F. Supp. at 411; see also Josey v. John R. Hollingsworth Corp., 996 F.2d 632 (3d Cir. 1993) (holding that employees'

_____

11. We note that, but for these precepts, clever discriminators might isolate each instance of discrimination and make it seem trivial or neutral. See Glass, 45 F.3d at 195; see also Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996) (evidence of time-barred harassment and discrimination against others in the plaintiff 's class was relevant); Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1511 (11th Cir. 1989) (acts directed at others can be evidence of discrimination against the plaintiff). We also note apposite New Jersey precedent that a plaintiff may present evidence about the harassment of other women to establish employer liability. See Lehmann v. Toys `R' Us, Inc., 626 A.2d 445, 462 (N.J. 1993).

remarks and racially derogatory notes sent by unidentified people were circumstantial evidence that management permitted an atmosphere of prejudice to infect the workplace).

The challenged evidence creates a basis for an inference that Hurley was targeted for abuse because she was a woman. It also gives reason to infer that the ACPD knew or should have known not only what was happening to its female officers but also, and most importantly, that the written sexual harassment policy was ineffective, and patently so. Indeed, it is hard to imagine evidence more relevant to the issue of whether a sexual harassment policy was generally effective than evidence that male officers did not respect it and that female officers were not protected by it.

Officer Rando and Ms. Cardy, for example, both testified about the dismissive and even retaliatory treatment they experienced when they reported male officers' misbehavior, and this was relevant, probative evidence that the ACPD was consistently insensitive to female employees' experiences of harassment. See Hunter v. Allis-Chalmers Corp., 797 F.2d 1417 (7th Cir. 1986) (evidence of frequent misconduct against plaintiff and others was "pertinent, perhaps essential" to the employer liability determination); Vinson v. Taylor, 753 F.2d 141, 146 (D.C. Cir. 1985) (same), aff'd sub nom. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986). This evidence remains highly relevant under Ellerth and Faragher. See Faragher, 118 S. Ct. at 2293 (discussing evidence of city's general failure to disseminate and enforce its sexual harassment policy in rejecting the availability of the affirmative defense in a particular case of harassment).

Aside from its relevance to the issue of whether the ACPD is liable for the hostile environment Hurley encountered, the evidence is also relevant to her intentional sex discrimination, quid pro quo, and retaliation claims. The general atmosphere of sexism reflected by the challenged evidence is quite probative of whether decisionmakers at the ACPD felt free to take sex into account when making employment decisions, when deciding whether to abuse their positions by asking for sexual favors, and when

21

responding to sexual harassment complaints. As Glass held, evidence of pervasive sexual harassment makes retaliation claims more credible, because harassers may be expected to resent attempts to curb their male prerogatives. See Glass, 34 F.3d at 195; see also Hawkins v. Hennepin Technical Ctr., 900 F.2d 153, 156 (8th Cir. 1990).

Evidence of sexually derogatory and sexist harassment makes disparate treatment claims more credible as well, since such discriminatory acts stem from similar motives. See Glass, 34 F.3d at 192; Josey, 996 F.2d at 641; Hawkins, 900 F.2d at 155; Hunter, 797 F.2d at 1421. Other courts have found similarly with respect to quid pro quo claims. See Heyne, 69 F.3d at 1479-80; Phillips v. Smalley Maintenance Servs., Inc., 711 F.2d 1524, 1532 (11th Cir. 1983); Sowers v. Kemira, Inc., 701 F. Supp. 809, 816 (S.D. Ga. 1988). In this case, because of its high probative value, there was no abuse of discretion in admitting the challenged testimony from other officers.12 Any putative prejudice was not unfair, and at all events was outweighed by the probative value. Nor are any of the other Rule 403 factors present to counsel exclusion.

We do believe that evidence of events from 1979 to 1981 was improperly admitted because it was too distant in time from the events at the center of the ACPD's liability. Hurley did not claim a continuing violation from 1979 to 1992, and the district court abused its discretion when it admitted evidence from that distinct period in Hurley's career. We may find such error harmless only if "it is highly probable that the error did not affect the outcome of the case." Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 53 (3d Cir. 1989); see also McQueeney v. Wilmington Trust Co., 779 F.2d 916, 924, 927-28 (3d Cir. 1985).

_____

12. We also note that the alleged vagueness in the testimony, which the ACPD emphasizes, is limited to the testimony about general conditions in the ACPD and not to the many specific incidents to which the witnesses testified. This "vagueness" stems from the fact that male officers' misconduct was apparently so common as to blend into the background except when something particularly egregious occurred. The extent to which witnesses' inability to identify dates and places affected the witnesses' credibility could be, and was, addressed on cross-examination.

22

In this case, the error was harmless. As the district court noted:

> This is a case where the plaintiff was compelled to attend roll call in front of a life-size drawing of herself performing oral sex as her supervisor, Madamba, sat eight feet away; where, in addition to pervasive graffiti directed at plaintiff, a sanitary napkin bearing sergeant's stripes dangled over the podium from which she spoke, and a dildo was affixed to a wall or ceiling nearby; and where plaintiff's professionalism and performance were constantly undermined because the men on the force could not tolerate a women among them. It is a case where the plaintiff's supervisor responded to plaintiff's entreaties by insinuating that he might be able to help her if only she would sleep with him.

Hurley, 933 F. Supp. at 413 (citations omitted). When viewed against the uncontestably relevant and admissible evidence, it is highly improbable that the improperly admitted evidence affected the judgment in this case. Indeed, were we to hold all of the evidence challenged by the ACPD inadmissible, we believe that its admission would still amount to harmless error, so clear is the evidence of the harassment Hurley experienced.

For the foregoing reasons, the ACPD's Rule 403-based evidentiary arguments fail.

B. Dr. Hoyme's "Surprise" Testimony

Dr. Hoyme, plaintiff's psychological expert, issued his first report on November 16, 1994. In that report, he wrote that "[m]y diagnosis [of Donna and Patrick Hurley] is Adjustment Disorder with mixed features of anxiety and depressed mood (309.28 DSM IV) . . . . This diagnosis carries an implied causal connection between their traumatic experiences (sexual harassment, hostile work environment, and subsequent harassment) and their symptoms." App. at 5387. Subsequently, on February 20, 1995, Dr. Hoyme submitted another report in response to a report issued by defendants' psychological expert, Dr. Toborowsky. According to Dr. Hoyme's rebuttal report:

23

> Mrs. Hurley has experienced severe emotional injury
> and pain as the result of sexual harassment in the
> course of her work in the Atlantic City Police
> Department. Contrary to Dr. Toborowsky's stance, it is
> not necessary to prove that she has developed
> diagnosable psychiatric disorder in order to recognize
> or validate this substantial harm.

Id. at 5849.

On March 2, 1995, the magistrate judge ordered that Dr. Hoyme's rebuttal report be barred as untimely. Hurley appealed this decision to the district court, and the court initially upheld the magistrate's decision. The court also ruled, however, that Hurley could renew this motion at trial when the court "would have a better sense of the significance of the testimony." Hurley, 933 F. Supp. at 408. Hurley renewed her motion at trial, and the district court overruled the magistrate's decision "[b]ecause [the court was] concerned that the magistrate judge's sanctions against the plaintiff cut too close to the essential truth-seeking function of the Court . . . ." Id. At trial, Dr. Hoyme testified about "another diagnosis that didn't neatly fit into the DSM criteria": a reaction to a "psychological assault." App. at 1667-68. He further testified that the defendants' conduct constituted an "aggressive attack on her" and a kind of "sexual assault" which caused severe pain comparable to a physical touching. Id. at 1726-29. In closing, Hurley's counsel also referred to Dr. Hoyme's "psychological assault" testimony as a basis for awarding damages.

The ACPD argues that Dr. Hoyme's reference to a "second diagnosis" regarding a "psychological assault" on Donna Hurley constituted unfair surprise because the testimony was materially different from that offered previously and provided the defendants with no meaningful opportunity for rebuttal. This unfair surprise, according to the ACPD, was "inconsistent with substantial justice" and warrants a new trial. We disagree.

A district court's decision to allow an expert to testify beyond the scope of his report is reviewed under an abuse of discretion standard. See Greate Bay Hotel & Casino v.

24

Tose, 34 F.3d 1227, 1236 (3d Cir. 1994). "We determine whether there has been an abuse of discretion by considering four factors: `(1) the prejudice or surprise in fact to the opposing party, (2) the ability of the party to cure the prejudice, (3) the extent of disruption of the orderly and efficient trial of the case, and (4) the bad faith or willfulness of the non-compliance.' " Id. (quoting Beissel v. Pittsburgh & Lake Erie R. Co., 801 F.2d 143, 150 (3d Cir. 1986)).

We cannot conclude that the district court abused its discretion by permitting Dr. Hoyme's so-called "second diagnosis." First, notwithstanding Dr. Hoyme's rebuttal report, his initial report hinted strongly at this "second diagnosis," because it contained an explanation of the severe harm inflicted by the extensive sexual harassment Hurley experienced. Second, the defendants actually received the rebuttal report and were unquestionably aware of the appealability of the magistrate judge's order. Moreover, the defendants had several weeks after Dr. Hoyme's testimony to prepare rebuttal testimony and, thus, cure any possible prejudice. Indeed, Dr. Toborowsky testified that he had previously read both the deposition and courtroom testimony of Dr. Hoyme. Third, there was no need to call any witnesses out of order or any other disruptions at trial. Finally, while this evidentiary dispute might have been the product of "discovery-based bickering between the lawyers" and the "institutional differences between lawyers, who demand unvarying precision, and psychiatrists," see Hurley, 933 F. Supp. at 408, there is no evidence of bad faith.

C. Inference of Jury Prejudice and Passion

The ACPD contends that the $700,000 punitive damage award was the "product of the same abandonment of`cool reason' in favor of `outrage and disgust' which shocked the trial court's conscience with respect to the compensatory damages." ACPD Br. at 46. Indeed, the ACPD argues that this "award was so excessive as to give rise to a clear inference that the jury verdict was the result of mistake, passion, prejudice or partiality." Id. at 43. Therefore, according to the ACPD, we must set aside the jury's verdict and order a new trial. Once again, we disagree.

25

In Dunn, we observed that a defendant would be entitled to a new trial, rather than remittitur, upon showing that "the jury verdict resulted from passion or prejudice." Dunn, 1 F.3d at 1383; see also 11 Charles Alan Wright et al., Federal Practice and Procedure S 2815, at 165 (2d ed. 1995) (remittitur is "not proper if the verdict was the result of passion and prejudice, since prejudice may have infected the decision of the jury on liability, as well as on damages"). We further rejected the argument, however, that "the size of the award alone was enough to prove prejudice and passion." Dunn, 1 F.3d at 1383; see also Mason v. Texaco, Inc., 948 F.2d 1546, 1561 (10th Cir. 1991) (reducing a punitive damage award of $25 million by one-half because it shocked the court's conscience, but upholding the jury's liability determination because there was no evidence it was tainted). Here, as in Dunn, the defendant's only evidence of jury prejudice and passion is the amount of the punitive damage award itself. This is insufficient, and the ACPD's argument cannot prevail.

D. Jury Charge on Hostile Work Environment

The ACPD also argues that it is entitled to a new trial because the district court erred in its charge to the jury on hostile work environment by mixing different concepts from Title VII and the LAD. Specifically, defendant contends that the district court strayed from Lehmann v. Toys`R' Us, Inc., 626 A.2d 445 (N.J. 1993), in which the New Jersey Supreme Court formulated the basic standard for determining whether acts of harassment in the workplace constitute invidious discrimination in violation of the LAD. Under the Lehmann standard, a plaintiff must demonstrate that "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Id. at 453.

The ACPD argues that the district court erred when it instructed the jury to consider ten factors, which the district court primarily derived from the ABA Model Charge[13]

_____

13. Section 104[2][b] of the ABA Model Charge provides the following list of factors that must be considered in hostile work environment claims:

26

and Title VII caselaw, when determining whether the ACPD was liable under the LAD. Finally, the ACPD argues that the district court failed to instruct the jury as to precisely how each of the factors bore on the issue of sexual harassment. "We generally review jury instructions for abuse of discretion to determine whether they are misleading or inadequate." Woodson v. Scott Paper Co., 109 F.3d 913, 929 (3d Cir.), cert. denied, 118 S. Ct. 299 (1997). "However, when the question is whether the instructions misstate the law, our review is plenary." Id. (citing Saverese v. Agriss, 883 F.2d 1194, 1202 (3d Cir. 1989)). We review jury instructions to determine whether, "taken as a whole, they properly apprised the jury of the issues and the applicable law." Dressler v. Busch Entertainment Corp., 143 F.3d 778, 780 (3d Cir. 1998) (quotation marks omitted).

Under the first prong of the Lehmann test, a plaintiff must show "by a preponderance of the evidence that she suffered discrimination because of her sex." Lehmann, 626

_____

(1) the total physical environment of the plaintiff's work area;

(2) the degree and type of obscenity that filled the environment of the workplace, both before and after the plaintiff arrived;

(3) the reasonable expectations of the plaintiff upon entering the environment;

(4) the nature of the unwelcome sexual acts or words;

(5) the frequency of the offensive encounters;

(6) the severity of the conduct;

(7) the context in which the sexual harassment occurred;

(8) whether the conduct was unwelcome;

(9) the effect on the plaintiff 's psychological well-being;

(10) whether the conduct was physically threatening;

(11) whether it was merely an offensive utterance;

(12) whether it unreasonably interfered with the plaintiff 's work performance.

ABA Model Charge S 104[2][b] (1994).

A.2d at 454. Because the LAD is not a fault or intent-based statute, a plaintiff "need not show that the employer intentionally discriminated or harassed her, or intended to create a hostile work environment." Id. at 454.

The second prong requires that the objectionable conduct be sufficiently "severe or pervasive" to state an actionable claim. See id. at 455 ("We emphasize that it is the harassing conduct that must be severe or pervasive, not its effect on the plaintiff or on the work environment." (citing Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991))). In adopting this test, the court expressly rejected the "regular and pervasive" standard set forth by this court in Andrews, 895 F.2d at 1482. The New Jersey Supreme Court concluded that the Andrews test strayed from the United States Supreme Court's standard in Meritor and "would bar actions based on a single, extremely severe incident or, perhaps, even those based on multiple but randomly-occurring incidents of harassment." Lehmann, 626 A.2d at 455. Indeed, the New Jersey Supreme Court recently concluded that a plaintiff created a triable issue based on a single racial slur. See Taylor v. Metzger, 706 A.2d 685 (N.J. 1998).14

The third prong of the Lehmann test considers the harassment from the perspective of a reasonable woman (or man, as the case may be). Such an objective, gender-specific standard, according to the court, "provides flexibility" by "incorporating community standards" and focuses attention "on the nature and legality of the conduct, rather than on the reaction of the individual plaintiff," Lehmann, 626 A.2d at 458, and it also "recognize[s] and respect[s] the difference between male and female perspectives on sexual harassment." Id. at 459.

_____

14. In Taylor, the plaintiff presented evidence that her chief ranking supervisor called her a "jungle bunny" in the presence of another supervising officer. The court concluded that these circumstances "were sufficient to establish the severity of the harassment and alter the conditions of plaintiff 's work environment." Id. at 693. Severity is measured by surrounding circumstances, see id. at 692, and " `[t]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.' " Lehmann, 626 A.2d at 455 (quoting Ellison, 924 F.2d at 878).

28

"Only an idiosyncratic response of a hypersensitive plaintiff to conduct that a reasonable woman would not find harassing is excluded by the reasonable woman standard." Id. at 458-59.

Finally, under the fourth Lehmann prong, a plaintiff must show that "her working conditions were affected by the harassment to the point at which a reasonable woman would consider the working environment hostile." Id. at 457. A plaintiff need not demonstrate psychological harm or economic loss.

In this case, the district court's hostile work environment sexual harassment charge provided as follows:

> It is important to understand that, in determining whether a hostile work environment existed at the Atlantic City Police Department, you must consider the evidence from the perspective of a reasonable woman in the same position. You must look at the evidence from the perspective of a reasonable woman's reaction to a similar environment under similar circumstances. That is, you must determine whether a reasonable woman would have been offended or harmed by the conduct in question. You must evaluate the total circumstances and determine whether the alleged harassing behavior could be objectively classified as the kind of behavior that would seriously affect the psychological or emotional well-being of a reasonable woman. The reasonable woman is simply an average woman of normal sensitivity and emotional make-up.

> It is equally important to understand, however, that the reasonable woman standard applies only to the issue of liability for hostile work environment sexual harassment. It does not apply to liability for intentional sexual harassment, retaliation, or quid pro quo harassment, nor to the calculation of damages.

> Plaintiff has alleged that she has been subjected to a hostile work environment because of harassment based on her sex. To prevail on this theory, she need not demonstrate any job benefits were conditioned on submitting to hostile sexual conduct or were denied because of refusing to give in to that conduct. Rather,

29

to establish a claim of hostile work environment sexual harassment, plaintiff must prove by a preponderance of the evidence that the conduct about which she complains, one, would not have occurred but for the employee's gender, and it was, two, severe or pervasive enough to make a, three, reasonable woman believe that, four, the conditions of employment are altered and the working environment is hostile or abusive.

The more severe the conduct, the less extensive it need be for you to find it is hostile.

Conversely, the less severe the conduct, the more persuasive [sic] or regular it should be in order for you to find that it is hostile.

Plaintiff's hostile work environment claim must be related to conditions which actually altered her own work environment. Statements, actions, or conditions which occurred at the Atlantic City Police Department outside the presence of plaintiff and plaintiff was unaware [sic] cannot be considered part of the hostile work environment, unless you find such statements, actions or conditions affected the plaintiff 's own work environment.

In evaluating plaintiff's hostile work environment claims you should consider the following factors: one, plaintiff's reasonable expectation upon entering the workplace; two, the total physical environment of the area in which plaintiff worked; three, whether plaintiff was exposed to sexually explicit words or comments, drawings, graffiti, or obscenity in the workplace, and, if so, the degree, persistence, and type such [sic] obscenity to which exposed; four, whether the sexually explicit words or comments, drawings, graffiti or obscenity were directed at plaintiff, and, if so, the frequency of the offensive encounters; five[,] severity of the conduct and the context in which it occurred; six, whether the conduct was unwelcome, that is, conduct plaintiff regarded as unwanted or unpleasant; seven, the likely effect on a reasonable woman's psychological well-being; eight, whether the conduct reasonably[sic] interfered with plaintiff's work performance; nine, the

30

extent to which supervisors upon learning of sexually harassing conduct, acted promptly and effectively to respond to such conduct; [ten], whether the complained of conduct was directed at men and woman alike.

It is not enough that the work environment was generally harsh, friendly [sic], unple[a]sant, crude or vulgar to all employees of both sexes. In order to find a hostile work environment sexual harassment, you must find that plaintiff was harassed because she is a woman. The harassing conduct may, but need not be sexual in nature. Rather, its defining characteristic is that the harassment occurs because of the victim's sex.

App. at 5276-79.

We conclude that the district court's hostile work environment charge, taken as a whole, properly apprised the jury of the issues and law under the LAD. The charge clearly and accurately set forth the four-prong test set forth in Lehmann. Moreover, the court's list of factors provided additional guidance to the jury for its consideration of whether the requisite elements of liability had been established. Although this nonexhaustive list was largely derived from the ABA Model Charge and Title VII caselaw, we believe that the New Jersey Supreme Court would find many of these factors useful and relevant for deliberations in a hostile work environment sexual harassment claim under the LAD.15 See Lehmann, 626 A.2d at 452 ("In construing the terms of the LAD, this Court has frequently looked to federal precedent governing Title VII . . . as a key source of interpretive authority." (citation and quotation marks omitted)). As a result, we reject the ACPD's argument.16

_____

15. Because certain factors may or may not be relevant in any given case, our conclusion is necessarily limited to the facts of this case. Moreover, we do not suggest that the New Jersey Supreme Court would only look to the ABA Model Charge and Title VII caselaw when fashioning a set of factors to guide the jury in its deliberations.

16. Because we conclude that the ACPD remains liable under the LAD, we need not consider whether the district court's charge misstated the law under Title VII.

31

We also find no merit in the ACPD's contention that one of the factors referenced in the charge, the plaintiff's reasonable expectation upon entering the workplace, is inconsistent with Lehmann's requirement that the finder of fact consider workplace hostility "from the perspective of a reasonable woman." ACPD's Br. at 49 (quoting Lehmann, 626 A.2d at 457-58). In this case we do not see the harm from the shifting reference. Indeed, we fail to see how this distinction could aid the ACPD since, if anything, the "reasonable expectation upon entering the workplace" factor seems to give an employer extra leeway when a woman enters what she knows to be a traditionally male preserve, whereas the generalized reasonable woman standard is less concerned with what a workplace has traditionally been like and focuses on what a reasonable woman may rightfully expect from her employers. Finally, we reject the ACPD's contention that the district court erred in failing to instruct the jury as to precisely how each of the factors bore on the issue of sexual harassment.

E. Faragher v. City of Boca Raton and Burlington Industries v. Ellerth

After the initial oral argument on this appeal, the Supreme Court decided Faragher v. City of Boca Raton and Burlington Industries v. Ellerth. These decisions substantially changed the law of Title VII on employer liability. The ACPD contends that it is entitled to a new trial under the Ellerth/Faragher standards. For a variety of reasons, however, we conclude that the new structure and taxonomy of Title VII liability makes no difference to the outcome in this case. We first address the ACPD's claim that it was entitled to an affirmative defense, and then discuss the effects of Ellerth and Faragher on the "quid pro quo" claims in the case.

1. The Affirmative Defense

The ACPD claims that the trial court's jury instructions were defective because the jury was instructed that the existence of an effective sexual harassment policy was merely a factor to be considered in imposing liability and not an absolute defense. There are four problems with this claim.

First, Ellerth and Faragher do not, as the defendants seem to assume, focus mechanically on the formal existence of a sexual harassment policy, allowing an absolute defense to a hostile work environment claim whenever the employer can point to an anti-harassment policy of some sort. The necessary elements of a defense are "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 118 S. Ct. at 2270. A stated policy should be "suitable to the employment circumstances." Id.

The proof at trial focused extensively on what the ACPD did and failed to do about the harassment--issuing written policies but not enforcing them, painting over offensive graffiti every few months only to see it go up again in minutes, failing to investigate sexual harassment as it investigated and punished other forms of misconduct. Although it diligently attempted to convince the jury that its policies and procedures protected it, the ACPD failed to make a colorable case that its policies met the Ellerth/Faragher standards. See Hurley, 933 F. Supp. at 419; cf. Payton v. New Jersey Turnpike Auth., 691 A.2d 321 (N.J. 1997) (holding that a slow remedial process or one that leaves an employee exposed to harassment cannot be effective). In Faragher, in fact, the Court found it unnecessary to remand for consideration of the newly codified defense, since the record established that Boca Raton failed to disseminate its policies or monitor the acts of its employees, so that as a matter of law it could not prevail on the defense. See Faragher, 118 S. Ct. at 2293; see also Booker v. Budget Rent-a-Car Sys., 17 F. Supp. 2d 735 (M.D. Tenn. 1998) (rejecting the affirmative defense on a summary judgment motion because the employer had notice of incidents of discrimination but failed to act on it).

A similar analysis applies here. The district court commented extensively on the ACPD's failure to implement anti-harassment policies or to inquire into the harassing behavior of any of its employees. It was evident that Madamba, a supervisor with the duty to stop harassment,

was aware of much of the harassment, even that which he did not himself inflict. The ACPD insists that there were five mechanisms that Hurley should have explored in full before suing: her direct supervisor, Internal Affairs, the Affirmative Action Officer, the Chief through his "open door policy," and the union grievance procedure. See ACPD Letter, July 16, 1998, at 5. However, there was extensive testimony at trial about the ineffectiveness of these mechanisms. Moreover, Hurley had no obligation to try all these mechanisms, because her immediate supervisor, who was responsible for preventing and redressing harassment pursuant to the ACPD's own policy, was on notice of the harassment. An employer cannot "use its own policies to insulate itself from liability by placing an increased burden on a complainant to provide notice beyond that required by law." Williamson v. City of Houston, 148 F.3d 462, 467 (5th Cir. 1998).17

Second, the ACPD apparently misreads the jury instructions. The liability instructions first stated that the ACPD would be liable for acts within the scope of a supervisor's employment, which was to be judged by the time, place, and foreseeability of the harassing acts. See XXII App. at A5281–82. The instructions continued that the existence of "a widely-disseminated anti-harassment policy or a well-publicized and an effective formal or informal complaint structure, training or monitoring mechanisms" would be evidence that sexual discrimination was not within the scope of employment. Id. at A5282.18 Then, the

_____

17. See also Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir. 1998) (holding that, if a direct supervisor who had the responsibility to stop harassment knew of and failed to act against it, the plaintiff has no further obligation to bring it to the employer's attention); Young v. Bayer
Corp., 123 F.3d 672, 675 (7th Cir. 1997) (finding it sufficient for a plaintiff to give notice to someone who should reasonably be expected to stop the harassment or refer the complaint up the chain of command to someone who can stop it).

18. The Ellerth/Faragher defense applies only to harassment occurring outside the scope of employment. See Ellerth, 118 S. Ct. at 2267. For harassment to fall within the scope of employment, the harasser must be furthering the employer's purposes or acting in what he believes to be his employer's interests. See id. at 2266. The Court did not discuss how such motivations were to be determined, and we need not today address

34

instructions set forth the standard agency law on which
Faragher and Ellerth relied––the employer is not liable for
acts outside the scope of employment unless (1) the
employer intended the conduct; (2) the employer was
negligent or reckless in that it knew or should have known
about the supervisor's actions and failed to take prompt
and effective remedial measures; or (3) the supervisor was
purporting to act as a supervisor, he had authority to
control the employee's working environment, and his
actions were aided and abetted by the authority delegated
by the employer. See XXII App. at A5282–83 (tracking
Lehmann, 626 A.2d at 461–62).

Next, the instructions listed factors to consider when
determining whether the employer's negligence contributed
to a supervisor's sexual discrimination: the existence of a
formal anti-harassment policy; the presence of effective
formal or informal complaint structures, training, and/or
monitoring mechanisms; the extent to which the employee
used the existing complaint procedures; and whether the
employer took prompt and effective remedial action in
response to complaints. According to the instructions, these
factors should be evaluated together. See id. at A5283
(tracking Lehmann, 626 A.2d at 463). Finally, the
instructions stated that the ACPD would be responsible for
harassment by non-supervisory employees if it knew or
should have known that such harassment was occurring
and failed to take preventive or curative measures when it
had reason to believe that harassment may have occurred;

_____

whether a patently ineffective harassment policy might communicate to
male employees that harassment was an acceptable, expected means to
interact with female officers. Rather, if the jury decided that the lack
of
an effective harassment policy justified holding the ACPD liable under a
scope of employment theory, the same result would have been mandated
under the Ellerth/Faragher standards for holding employers liable for
negligence or for imposing vicarious liability when supervisory
harassment creates a hostile work environment. The overlap between the
standards was made clear by the instructions on negligence, which we
describe infra in text. Thus, although this section of the instructions
would no longer be appropriate to describe the scope of employment in
a Title VII case, it did not mistakenly allow liability to be imposed in
any
circumstances in which an employer should properly be absolved.

35

the jury was instructed to consider whether the ACPD took "all reasonable steps necessary to address sexual harassment." Id. at A5284.

The ACPD has failed to identify how these instructions conflict with Faragher and Ellerth, which relied on the same agency principles as Lehmann. Indeed the able trial judge quite presciently anticipated Faragher and Ellerth. The ACPD argues that the instructions allowed the jury to find it liable if the jury concluded that some factors outweighed the existence of an effective sexual harassment policy. See ACPD Letter, July 16, 1998, at 8. The ACPD presumably means that the jury could have used the extent of the harassment to discount the ACPD's anti-harassment policy, although the ACPD is not clear on this issue. Of course, under Faragher, the extent of the harassment would be helpful evidence of the actual effectiveness of a formal policy, which is a necessary element of the Faragher defense. But that is beside the point, as the ACPD has confused the part of the instructions that sets forth a ten-factor test for determining whether a hostile environment existed, see supra Section II.A.4, with the part of the instructions that dealt with the ACPD's liability assuming that the jury found a hostile environment existed, see XXII App. at A5282-84. If anything, the ACPD got to double-dip on its harassment policy, because the jury was told to factor it into the initial hostile environment determination and then to use it again when considering liability. See Payton, 691 A.2d at 327 (approving this dual use).

A third reason to reject the ACPD's contention is that Faragher and Ellerth establish that the defense of employer due care is an affirmative one. See Ellerth, 118 S. Ct. at 2270. Thus, the employer bears the burden of proof. The instructions given at trial put the burden on Hurley to prove that the ACPD was liable for negligence despite its harassment policy and other remedial measures. Any error, therefore, worked in favor of the ACPD and could not justify a new trial.

Finally, Faragher and Ellerth do not necessarily control this case, which was also brought under the New Jersey LAD. Even if the jury instructions are not quite right with respect to Faragher, there is no colorable argument that

36

they misstated New Jersey law. For all these reasons, we conclude that these recent additions to Title VII jurisprudence do not require us to reverse the judgment of the district court.

## 2. The Quid Pro Quo Instruction

Hurley's quid pro quo claim was based on Madamba's alleged sexual invitations to her. She testified that when she complained about harassment to Madamba, he replied that women in the private sector avoided harassment because they "sleep with their bosses." When she attempted to change the subject and commented on Madamba's apparent weight loss, he stated that he lost weight by "having sex a few times a day," and that women came to him "when they're ready." Hurley interpreted this entire conversation as a solicitation for sex.

The dissent argues that Ellerth and Faragher require us to reverse because those cases held that there could be no quid pro quo claim as such if the plaintiff neither submitted to sexual demands nor suffered retaliatory action when she refused to submit. The jury instructions, however, required only that the jury find either that a supervisor conditioned tangible job benefits on submission to unwelcome sexual conduct, or that a supervisor penalized Hurley for refusing to participate in such conduct. It is possible, though not certain, that such instructions could be read to cover threats that were not acted upon. We agree with the dissent that Ellerth and Faragher largely eliminated the distinction between hostile work environment claims and quid pro quo claims, focusing instead on the presence or absence of tangible adverse employment actions. See Durham Life Ins. Co. v. Evans, ___ F.3d ___, 1999 U.S. App. LEXIS 587 (3d Cir. Jan. 22, 1999). However, we conclude that the judgment should nonetheless be upheld.

The dissent persuasively identifies the reasons that the quid pro quo claim was the least tenable of Hurley's claims, at least under Faragher and Ellerth. [19] In fact, the conduct

_____

19. We have no doubt that Madamba's suggestive remarks could be interpreted as a threat, and we do not mean to suggest that remarks of this sort cannot found a quid pro quo claim, though we agree with the

37

of which she complained was part of the hostile work environment she experienced, and this would necessarily have been apparent to the jury.20 But in light of the total record here, we are satisfied that no jury would have found the defendants liable solely on the basis of the quid pro quo instruction. Multiple sources--including physical evidence --corroborated the most egregious examples of sexual harassment, including the tampon incident and the obscene graffiti, see, e.g., infra n.5, while the only evidence of Madamba's suggestion came from Hurley's testimony. To us, it is inconceivable that a jury would have believed her testimony on this one issue, concluded that the ACPD was vicariously liable for one advance, and discounted the other incidents, which were sufficiently pervasive to consitute a hostile environment. Juries may be unpredictable, but we are not willing to posit total illogic, which would be contrary to our faith in the jury system as a whole. We are thus persuaded that any error was harmless.

We addressed a similar issue in Murray v. United of Omaha Life Insurance Co., 145 F.3d 143 (3d Cir. 1998):

> We agree that the jury charge as given by the district court did not conform to New Jersey law as we predict it. Nonetheless, we will not reverse a judgment where

_____

dissent that the evidence of retaliation for refusal to accede is gossamer.
Nor need we predict how New Jersey will react to Faragher and Ellerth. The LAD is a remedial statute, in some respects broader and more flexible than Title VII. See Lehmann, 626 A.2d at 452; id. at 460 (holding employers strictly liable for equitable damages and relief). This is so even
though New Jersey often looks to the federal system for interpretive authority. See id. at 452. We thus believe it quite possible that New Jersey might retain a quid pro quo cause of action as such even after Ellerth and Faragher. The District Court's instructions, as the dissent notes, see Dissent at 66, are consistent with Lehmann. See Lehmann, 626 A.2d at 452; see also Pukowsky v. Caruso, 711 A.2d 398, 403 (N.J. Super. Ct. App. Div. 1998).

20. Madamba's alleged conduct is the kind of conduct for which the ACPD could attempt to interpose its affirmative defense, but, as we have already held, that defense would fail because the ACPD's dereliction was even worse than that in Faragher, in which the Court declined to offer the defendants an opportunity to make out the defense on remand.

38

> "it is highly probable that the error did not contribute
> to the judgment," McQueeney v. Wilmington Trust Co.,
> 779 F.2d 916, 924 (3d Cir. 1985), i.e., where the
> challenged error was harmless.

Id. at 156 (footnote omitted). An issue similar to that in this
case arose in American Airlines, Inc. v. United States, 418
F.2d 180 (5th Cir. 1969), in which the District Court
instructed the jury that it could return a verdict for the
plaintiff if it found negligence in any one or more of thirty
particulars. Each was supported by substantial evidence
except one, and on that one count it was factually
impossible that liability could appropriately be found. The
court found that "it is . . . inconceivable that in the mass
of testimony so clearly establishing negligence in thirty
other particulars this issue could have influenced the
verdict against American." Id. at 195 (citing Fed. R. Civ. P.
61). Although there were fewer than thirty viable theories in
this case, the weight of evidence and argument on the other
theories of liability leads us to the same conclusion here.

We concede the general correctness of the dissent's
proposition that faulty instructions on which a general
verdict could have been based require reversal. The
foundational case of Maryland v. Baldwin, 112 U.S. 490
(1884), addressed itself equally to faulty instructions and to
erroneous admission of evidence, and announced that such
errors require reversal. See id. at 493 ("If . . . upon any one
issue error was committed, either in the admission of
evidence or in the charge of the court, the verdict cannot be
upheld . . . ."). It has long been acknowledged, however,
that Baldwin does not speak to the harmless error
situation. See Asbill v. Housing Auth. of the Choctaw Nation,
726 F.2d 1499, 1504 (10th Cir. 1984) ("We note[Baldwin]
does not paint with as broad a brush as appears from the
language quoted. As with all errors committed at trial, a
litmus test for reversal is whether the appellant was
thereby unjustly prejudiced."). Evidentiary errors are
subject to harmless error analysis, and the same is true for
errors in instruction. See id.

Given Federal Rule of Civil Procedure 61's command to
disregard "any error" that does not affect "the substantial
rights of the parties," and the authorities set forth in the

39

margin,21 we do not believe that we are creating a new rule. The cases cited by the dissent for the proposition that we must reverse are distinguishable because they deal with instances in which the record rendered it impossible to determine the basis for the jury's decision. We discuss them, too, in the margin.22 To the extent that the dissent is

─────────────────────────────────────────────────

21. See also Pressley v. Haeger, 977 F.2d 295, 298 (7th Cir. 1992) (applying harmless error analysis to faulty instructions that, given the evidence, were unlikely to have influenced the jury); Kern v. Levolor Lorentzen, Inc., 899 F.2d 772, 777 (9th Cir. 1990) (where the relevant facts were the same for all theories, the evidence and argument focused on a legally correct theory, and it was unlikely that the incorrect theory influenced the jury, a verdict could be upheld despite one erroneous instruction); Kassel v. Gannett Co., 875 F.2d 935, 950 (1st Cir. 1989) (invoking harmless error rule for faulty instructions but rejecting it on the merits because of the evidence and arguments at trial); Lusby v. T.G. & Y. Stores, Inc., 796 F.2d 1307, 1310 (10th Cir. 1986) (finding that an improper instruction, identical to one rejected by the Supreme Court because it did not contain all the necessary elements, did not mandate reversal because there was "substantial evidence" supporting the correct theory of liability, and holding harmless error analysis appropriate to jury instructions "when the erroneous instruction could not have changed the result of the case"); Square Liner 360, Inc. v. Chisum, 691 F.2d 362, 377 (8th Cir. 1982) (applying Baldwin with harmless error analysis); Horne v. Georgia S. & Fla. Ry. Co., 421 F.2d 975, 980 (5th Cir. 1970) (finding a charge, if erroneous, harmless because the underlying facts so firmly supported the verdict on a proper charge); Roginsky v. Richardson–Merrell, Inc., 378 F.2d 832, 837–38 (2d Cir. 1967) (applying similar reasoning when one theory was improperly submitted to the jury); 11 Wright et al., Federal Practice & Procedure S 2886, at 467–70 ("Errors in instructions routinely are ignored if a motion for a directed verdict should have been granted, or if the erroneous instruction went to an issue that is immaterial in light of the jury's verdict, or if it is otherwise apparent that the error could not have changed the result." (footnotes omitted)).

22. See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 534 (3d Cir. 1998) (portion of instructions invited the jury to use impermissible factors, and, given the focus of the trial evidence, "such infection almost certainly occurred"); Wilburn v. Maritrans GP Inc., 139 F.3d 350, 361 (3d Cir. 1998) (jury could have based liability on incidents of alleged negligence for which the standard of care was beyond common knowledge, and there was no expert testimony to guide them as to those incidents); Avins v. White, 627 F.2d 637, 646 (3d Cir. 1980) (reversing a

concerned about broad application of the harmless error rule, we agree entirely, and emphasize that our decision is founded on the extreme facts of this case. Because any error in the quid pro quo instruction could not by any stretch of the imagination change the verdict, we need not reverse.

III. Punitive Damages

The ACPD argues that the district court erred by failing to instruct the jury that punitive damages could only be awarded against the ACPD "if there was `actual participation by upper management or willful indifference.' " ACPD's Br. at 12 (quoting Lehmann, 626 A.2d at 464).23

_____

judgment based on the "distinct possibility" that the jury imposed liability based on incidents of defamation that should not have been submitted to the jury); cf. McKenna v. Pacific Rail Serv., 32 F.3d 820, 831–32 (3d Cir. 1994) (reversing judgment when an erroneous portion of the jury instructions "more than likely" guided the jury's deliberations). Carden v. Westinghouse Electric Corp., 850 F.2d 996 (3d Cir. 1988), on which the dissent relies, concerned a situation in which the verdict could have been based on erroneously admitted "direct" evidence of discrimination; here, the instructions did not require the jury to look at evidence it should not have considered. Indeed, even Simko v. C & C Marine Maintenance Co., 594 F.2d 960 (3d Cir. 1979), while setting forth the general rule that errors in instruction require reversal, also cited with approval Morrissey v. National Maritime Union, 544 F.2d 19, 26–27 (2d Cir. 1976), describing its holding as follows: "[T]he general rule . . . must be followed unless it can be stated with confidence that the same verdict would have been returned even if the invalid claim had not been submitted to the jury." Simko, 594 F.2d at 967.

23. The ACPD raises two other arguments concerning the punitive damage award, but they need not detain us long. First, the ACPD argues that plaintiff 's punitive damage award must be vacated as a matter of law because "both public policy and the most reasonable interpretation of the statutes [i.e., the Tort Claims Act and the LAD] support the conclusion that punitive damages should not be available against a public entity under the [LAD]." ACPD's Br. at 20. However, we explicitly rejected this argument in Gares v. Willingboro Township, 90 F.3d 720 (3d Cir. 1996), and we are unaware of any developments that call this decision into question. Second, the ACPD contends that the punitive damage award must be vacated because the jury acted inconsistently

41

Because the ACPD did not object to the district court's charge on this ground, we will review this claim for plain error.

The ACPD asserts that our plain error analysis should be guided by the New Jersey Appellate Division's decision in Maiorino v. Schering-Plough Corp., 695 A.2d 353 (N.J. Super. Ct. App. Div.), certif. denied, 704 A.2d 19 (N.J. 1997). In Maiorino, the court observed that"a jury charge on punitive damages must include the instruction that upper management has to have . . . participated in or shown willful indifference to the situation." Id. at 368–69 (emphasis added) (citing Rendine v. Pantzer, 661 A.2d 1202 (N.J. 1995)). In fact, the court held that this concept is so essential to a fair trial that "the failure to charge the jury with the necessity of finding upper management's involvement to justify a punitive award is such a fundamental flaw that [an appellate court] must recognize it as a matter of plain error." Id. at 368 (citation omitted). While the Maiorino decision provides persuasive authority regarding the substantive correctness of a jury charge in a diversity case such as this, it is well established that the question of whether error is plain is one of federal law. See Hinds v. General Motors Corp., 988 F.2d 1039, 1046 (10th Cir. 1993) (discussing harmless error); see also Beardshall v. Minuteman Press Int'l, Inc., 664 F.2d 23, 27 (3d Cir. 1981) ("[T]he failure to object to jury instructions and the consequences thereof are procedural and are to be governed by federal law."). Accordingly, we must look to this

_____

when it imposed punitive damage liability on the ACPD but not on Madamba, the principal upper manager who was involved. This argument is also without merit. Punitive damages are awarded to deter and punish, and the jury could easily have concluded that the ACPD should pay punitive damages because both its potential for harm and its responsibility for the widespread harassment were far greater than Madamba's alone. Contrary to the ACPD's portrait of the facts, the testimony indicated that Madamba was far from a lone bad apple poisoning the ACPD. Moreover, the district court properly instructed the jury that an award of punitive damages was purely discretionary. We need not inquire further about why the jury chose to exercise its discretion in this manner.

42

court's plain error jurisprudence when considering the ACPD's appeal with respect to the punitive damage award.

We have repeatedly stated that, "[i]n the absence of a party's preservation of an assigned error for appeal, we review only for plain error, and our power to reverse is discretionary." Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 89 F.3d 976, 993 (3d Cir.) (quoting Fashauer v. New Jersey Transit Rail Operations, Inc., 57 F.3d 1269, 1289 (3d Cir. 1995)), cert. denied sub nom. Jackson v. Chemical Leaman Tank Lines, Inc., 117 S. Ct. 485 (1996). However, we should exercise our discretion sparingly so that Rule 51 and the beneficial policy goals it serves are not emasculated. See Chemical Leaman, 89 F.3d at 993-94; McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 770 n.31 (3d Cir. 1990). "Thus, we should notice the error only if [it] is fundamental and highly prejudicial or if the instructions are such that the jury is without adequate guidance on a fundamental question and our failure to consider the error would result in a miscarriage of justice." Fashauer, 57 F.3d at 1289 (quoting Bereda v. Pickering Creek Indus. Park, Inc., 865 F.2d 49, 53 (3d Cir. 1989)) (alteration in original) (internal quotation marks omitted).

In the present matter, there can be no doubt that the district court's charge was erroneous. The New Jersey Supreme Court has instructed that two distinct conditions must be satisfied before punitive damages may be awarded under the LAD. First, "punitive damages can only be assessed against an employer if there was `actual participation by upper management or willful indifference.' " Maiorino, 695 A.2d at 368 (emphasis added) (quoting Lehmann, 626 A.2d at 464); see also Maczik v. Gilford Park Yacht Club, 638 A.2d 1322, 1326 (N.J. Super. Ct. App. Div. 1994). Second, a plaintiff must also set forth "proof that the offending conduct [is] `especially egregious.' " Rendine, 661 A.2d at 1215 (quoting Leimgruber v. Claridge Assocs., Ltd., 375 A.2d 652 (N.J. 1977)). Conduct may be sufficiently egregious if it is "intentional, malicious, and `evil-minded.' " Gares v. Willingboro Twp., 90 F.3d 720, 728 (3d Cir. 1996) (quoting Rendine, 661 A.2d at 1215); see also Rendine, 661 A.2d at 1215 ("Our cases indicate that the requirement [of willfulness or wantonness] may be satisfied upon a showing

43

that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." (citation and internal quotation marks omitted)).

By contrast, the district court's punitive damage charge clearly failed to instruct the jury on the upper management requirement:

> If you find that plaintiff has established that either the Atlantic City Police Department or Henry Madamba is responsible for having engaged in acts of sexual discrimination against the plaintiff, you must consider whether to award punitive damages. You are not to consider the issue of punitive damages against Nicholas Rifice.
>
>  . . . .
>
> It is not sufficient to award punitive damages solely on the basis that a defendant has engaged in acts of sexual discrimination.
>
> You may award plaintiff punitive damages solely on the basis that a particular defendant maliciously or wantonly violated plaintiff's rights, and an act is done maliciously if it is prompted by ill will or spite toward the injured person, an evil-minded act. An act is done wantonly if it is done with a reckless, callous or deliberate disregard of the injured person's rights. The plaintiff must prove by a preponderance of the evidence that the defendant acted maliciously or wantonly.
>
>  . . . .
>
> In making your decision you should consider the purpose of punitive damages. You may consider whether the punitive damages are appropriate in order to punish the defendant adequately, whether punitive damages are necessary to prevent the defendant from committing these acts again, or whether punitive damages are likely to prevent others from committing similar acts.
>
> If you find the plaintiff is entitled to an award of punitive damages, the court will hold a further proceeding to determine the amount of that award.

44

App. at 5287–89 (emphasis added).

We conclude that the district court committed plain error when it failed to instruct the jury that punitive damages could only be assessed if there was "actual participation by upper management or willful indifference." The court's instructions failed to provide proper guidance for the jury on a fundamental question. Moreover, our failure to consider the error would result in a miscarriage of justice. There was also serious disagreement at oral argument and in the parties' briefs about whether Madamba was actually part of upper management during the relevant times. 24 Accordingly, we will vacate the punitive damage award against the ACPD.

## IV. The Individual Defendants

### A. Madamba

#### 1. Assorted Challenges

Madamba raises a number of arguments on appeal. First, he contends that he was entitled to judgment as a matter of law because the jury's finding of individual liability under N.J.S.A. 10:5-12(a) was against the weight of the evidence. Implicit in this argument is Madamba's assumption that the jury returned a verdict of individual liability under N.J.S.A. 10:5-12(a). We do not agree with this assumption. The district court's charge in this case clearly stated that the individual defendants were liable, if at all, for aiding and abetting the employer's violation of the Act.

Hurley argues that supervisors may be individually liable as employers under the LAD. The New Jersey courts have not specifically addressed the issue. The dissent makes a cogent argument for individual liability, and it is clear that reasonable people can disagree on this point. But the New

_____

24. On remand, the district court must determine whether Madamba was part of upper management. The ACPD claims that Madamba was a captain, along with numerous others with that rank. Although Madamba clearly was a supervisor of the personnel under his command, the ACPD contends that he did not establish policy and was not at the top tier of the department so as to be part of upper management. If a factual dispute should arise, however, the issue would be reserved for the jury.

45

Jersey decisions cited by the dissent, see Dissent at 74-77, did not rule on individual supervisory liability, and hence we do not find them controlling. Nor do we think the statutory text offers guidance. While an "employer" may be "one or more individuals" under N.J.S.A. 10:5-5(a), that does not necessarily mean that supervisors, themselves employed by individuals or corporations, are "employers." Title VII defines "employer" to include "a person . . . who has fifteen or more employees" or "any agent" of such a person, 42 U.S.C. S 2000e(b), and it could be subjected to the same analysis the dissent uses to find individual liability possible under LAD.

We also note that imposing direct liability on supervisors, who are likely to be substantially judgment-proof, will not significantly add to the force of anti-discrimination law, which already gives employers incentives to ban discrimination and monitor supervisors' activities. We think that there is insufficient reason to predict that New Jersey would diverge from the federal scheme on this point. See, e.g., Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1077-78 (3d Cir. 1996). In sum, while the point is close, as well as unclear, we are simply not willing to predict that New Jersey would include supervisors in the statutory definition of "employer."25

Second, Madamba joins the ACPD's evidentiary challenges and its attack on the hostile work environment charge, which we have already rejected. Third, he objects that the court permitted the jury to find liability against Madamba on four separate theories of liability when they should have only considered liability for hostile work environment sexual harassment. We do not agree, because the various theories of liability were properly submitted to the jury. There was sufficient evidence on all theories to go to the jury, and the instructions clearly indicated that the mere presentation of a possible theory to the jury did not mean that any defendant was liable on that theory, or on any theory. We reiterate that the instructions indicated that
_____

25. Trends may change, however, and a panel looking at this issue a year from now might see New Jersey pursuing a different course on supervisory liability through section 10:5-5(a).

the individual defendants were liable, if at all, for aiding and abetting the employer's violation of the Act. 26

Fourth, Madamba argues that the court's compensatory damages charge failed to instruct the jury "that it cannot award damages for any conduct that plaintiff was not subjected to, aware of, or with respect to Madamba, which occurred prior to 1990." Madamba Br. at 49-50. But the relevant section of the instructions adequately limited Madamba's exposure by setting forth the time limits on recovery and the purposes for which the jury could use evidence of acts not directed at Hurley, even though it did not specifically mention Madamba at that point. See supra Section II.B.

2. Aiding and Abetting

Finally, Madamba contends that the court's aiding and abetting instruction permitted the jury to impose individual liability under an erroneous standard. The LAD provides that it is unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." N.J.S.A. 10:5-12(e). In our decision in Failla v. City of Passaic, issued after the verdict in this case, we held that individual supervisors may be liable for aiding and abetting under the LAD. In reaching this

_____

26. Madamba particularly assails the availability of a quid pro quo instruction, which we discuss in greater detail supra Section II.E.2. The evidence to support Hurley's quid pro quo theory was a conversation she had with Madamba in which she complained about harassment and he responded that women in the private sector protect themselves from harassment by "sleeping with" their bosses and that women approached Madamba for sex "when they're ready." After she made no response to these suggestive comments, he allegedly took further discriminatory action against her by transferring her to a less desirable position. However, as we suggested above, this is less a quid pro quo case than a hostile environment case, inter alia because it seems more plausible that the transfer, if retaliatory, was based on Hurley's memo alleging harassment and not on her rejection of Madamba's putative advances. At all events, as discussed below in Section IV.A.2, we conclude that a reasonable jury could impose aiding and abetting liability on Madamba for his substantial contribution to the hostile work environment; his putative advances could be evidence of aiding and abetting.

47

conclusion, we predicted that the New Jersey Supreme Court would follow the Restatement (Second) of Torts S 876(b) to define aiding and abetting liability under the LAD. See Failla, 146 F.3d at 158. That section provides "that a person is liable for harm resulting to a third person from the conduct of another when he `knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . .' " Id. (quoting Restatement (Second) of Torts S 876(b)). We also predicted that, under New Jersey law, "inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement." Id. at 158 n.11 (citing Dici v. Pennsylvania, 91 F.3d 542, 553 (3d Cir. 1996)).

While we have rejected a requirement that an individual and an employer share the same discriminatory intent in order to find aiding and abetting liability, see Failla, 146 F.3d at 157, we have not fully elucidated the principles that might allow a harassing supervisor to be individually liable for aiding and abetting the actionable conduct of his employer, when the challenged conduct is failing to stop the supervisor's own harassment. Cf. United States v. Sain, 141 F.3d 463, 474 (3d Cir. 1998) (finding that a person can aid and abet a corporation that he or she fully owns and controls). This is a somewhat awkward theory of liability. We believe, however, that it can be explained in this manner: A supervisor, under New Jersey law, has a duty to act against harassment. See Taylor, 706 A.2d at 691. This duty can be violated by deliberate indifference or affirmatively harassing acts. When a supervisorflouts this duty, he subjects himself and his employer to liability. Cf. Judson v. Peoples Bank & Trust Co., 134 A.2d 761 (N.J. 1957) (holding that both agent and principal will be liable when the agent acts within the scope of his employment but for his own purposes).

The ACPD's wrongful conduct in this case was inaction -- its tolerance of sexual harassment. The jury had evidence before it that Madamba assisted this tolerance by tolerating and even encouraging the harassment. As part of the chain of command that Hurley was expected to follow, he controlled her access to the most effective potential

solutions to the harassment. Instead of taking steps to assist her, he told her that she should stop complaining or it would only get worse; he suggested that sleeping with him might protect her; he laughed at the drawings and graffiti about her; and he demeaned her as an officer on a daily basis. When she finally went over his head and requested a transfer because of the harassment, he gave his superior a memo accusing her of lying. We are also mindful of the moral authority of a police captain over his officers. When Madamba laughed at Hurley's discomfort and denigrated her, his officers could easily learn the lesson that harassing women was part of being an ACPD officer.

Madamba arguably failed to stop the harassment because he wanted it to continue. But, as Failla held, there is no requirement of "shared intent" between the primary wrongdoer and the aider and abettor. If Madamba's malice substantially assisted the ACPD's inaction, then he is an aider and abettor despite any difference in state of mind, assuming that the ACPD can be said to have a mental state. His liability can be grounded in his failure to stop the harassment, which included both active and passive components.

Because we conclude that Madamba could be liable for aiding and abetting, we must decide whether the jury instructions adequately set forth the applicable law. Based on Restatement S 876(b), courts have determined that the tort of aiding and abetting involves three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983); see also In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1495 (8th Cir. 1997); Metge v. Baehler, 762 F.2d 621, 624 (8th Cir. 1985).27

_____

27. To determine whether a defendant provided "substantial assistance," the comments to section 876 of the Restatement provide a list of five

49

The district court provided the following charge for aiding and abetting:

> [I]ndividual defendants . . . may be held liable only for their individual, affirmative wrongful acts. They may not be held liable for the conduct of others, nor for their inaction or delay in responding to such conduct. An individual defendant may be held liable, however, if he aids, abets, incites, compels or coerces another person's unlawful acts of discrimination.
>
> . . . .
>
> Aid is defined as meaning to assist, support or supplement the efforts of another. Abet is defined as meaning to encourage, counsel, incite or instigate the commission of unlawful conduct.
>
> In order the [sic] aid or abet another to commit an unlawful act, it is necessary that the defendant willfully and knowingly associate himself in some way with the unlawful act, and that he willfully and knowingly seek by some act to make the unlawful act succeed.

App. at 5284, 5314.

Although the district court's charge is compatible in some respects with the substance of section 876(b), the court misstates the law in two crucial respects: First, the charge does not allow for liability based on inaction. To be sure, Madamba can hardly claim he was prejudiced by this particular omission, because the jury concluded that he committed affirmative, harassing conduct. But the instructions also allowed the jury to impose liability for mere assistance, rather than substantial assistance. This was incorrect. Moreover, we cannot conclude that it is highly probable that the absence of a substantial assistance

_____

factors: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." Restatement (Second) of Torts S 876(b) cmt. d. (1979). Additionally, the court in Halberstam provided a sixth factor, the duration of the assistance provided. See Halberstam, 705 F.2d at 484.

requirement did not affect the jury's verdict. See McQueeney, 779 F.2d at 924. Accordingly, we must vacate the judgment against Madamba and order a new trial. [28]

## B. Rifice

Hurley argues in her cross-appeal that the district court's aiding and abetting charge misstated the law under the LAD by requiring a finding of affirmative sexual harassment before Rifice could be found individually liable. She also argues that the district court erred by striking her punitive damage claim against Rifice. We agree.

As noted above, the district court's aiding and abetting charge provided that the "individual defendants such as Nicholas Rifice and Henry Madamba . . . may only be held liable for their individual, affirmative wrongful acts." XXII App. at 5284. However, in Failla, we expressly rejected this view and concluded that "inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement." Failla, 146 F.3d at 158 n.11. Accordingly, the district court's charge misstated the law under the LAD. The district court noted that the charge might well have determined the jury's verdict. See Hurley, 933 F. Supp. at 417-18.

The evidence against Rifice mainly concerned his awareness of and apparent indifference to the harassment. Rifice testified that he did nothing to stop the harassment because the harassers should already have known better

_____

28. Madamba additionally argues that the jury instructions were flawed because they covered aiding and abetting "another person's unlawful acts" and then, when the jury inquired further, the court stated that the defendant had to "willfully and knowingly associate himself with the unlawful act." Madamba Letter at 8. He argues that this is erroneous because the instruction should have required association with the employer and not the act. This is a misreading of Failla, which rejected a shared intent requirement. Moreover, Madamba was associated with his employer as a matter of course. Finally, the New Jersey Appellate Division case of Baliko v. Stecker, 645 A.2d 1218 (N.J. Super. Ct. App. Div. 1994), undermines Madamba's position. Baliko held that aiding and abetting liability could exist when one union member aided other union members and the sum total of acts was sufficient to cause the union to be liable.

51

and he did not believe that he could do anything about it. This kind of knowing inaction by a high-level employee with responsibility over Hurley and her harassers could, we think, rise to the level of substantial assistance. We will therefore vacate the judgment in favor of Rifice and the district court's order striking plaintiff's punitive damage claim against Rifice.

C. Mooney

Hurley next argues that the district court erred by granting summary judgment in favor of defendant Mooney.29 Mooney argued, and the district court agreed, that he was entitled to summary judgment on Hurley's LAD claim because, as a non-supervisory co-employee, he was not an "employer" for purposes of N.J. Stat. Ann.S 10:5-5(e).30 See Hurley v. Atlantic City Police Dept., 1995 WL 854478, at *10 (D.N.J. Aug. 4, 1995). The court reached this conclusion, in part, because "non-supervisory co-employees cannot be held liable under Title VII, and New Jersey courts have often looked to that statute to resolve questions under the NJLAD." Id. (citing Lehmann, 626 A.2d at 452). Although Mooney may have had considerable unofficial power because of his well-known promotion prospects and high-ranking relatives, he was not an "employer."

_____

29. We review the district court's decision granting summary judgment de novo, and we apply the same test the district court should have applied in the first instance. See Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996); Helen L. v. DiDario, 46 F.3d 325, 329 (3d Cir. 1995). We must determine, therefore, whether the record, when viewed in the light most favorable to Hurley, shows that there is no genuine issue of material fact and that Mooney was entitled to summary judgment as a matter of law. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

30. The Act provides that an employer "includes all persons as defined in subsection a. of this section unless otherwise specifically exempt under another section of this act, and includes the State, any political or civil subdivision thereof, and all public officers, agencies, boards or bodies." N.J. Stat. Ann. S 10:5-5(e). Subsection (a) provides that the term "[p]erson includes one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries." N.J. Stat. Ann. S 10:5-5(a).

Hurley argues that S 10:5-5(e) is not relevant because Mooney was individually liable under the LAD as an aider and abettor. We predict that, under New Jersey law, a nonsupervisory employee cannot be held liable as an aider and abettor for his own affirmative acts of harassment, because such affirmative acts do not substantially assist the employer in its wrong, which is its failure to prevent and redress harassment by individual employees. 31 Rather, a nonsupervisory employee's harassment takes advantage of the employer's wrongful conduct; it is the employee who seems to be "aided and abetted" by the employer.32 A supervisor, by contrast, may be liable as an aider and abettor for active harassment or knowing and willful inaction, because in either case the supervisor violates his or her duty as a supervisor to prevent and halt harassment.33

_____

31. The dissent argues that the employer's wrong can also consist of the wrongs of its supervisors who commit willful harassment. This is a thorny question of agency law; usually, the employer is said to be vicariously liable for certain acts of its agents, as in Ellerth and Faragher,
and directly liable for its own negligence, if any, in allowing its agents to
behave badly. Query whether vicarious liability means that a person who aids and abets an agent also aids and abets the principal? We need not resolve this nice question, however, because the dissent's argument presupposes that Madamba can be held individually liable as a harasser under N.J.S.A. S 10:5-5(a), a proposition we have already predicted that New Jersey courts would reject. Moreover, if the claim were that Mooney substantially assisted Madamba's harassment, no reasonable jury could find that Mooney's conduct rose to the level of substantial assistance based only on the two incidents recited by the dissent.

32. Mooney claims that a nonsupervisor cannot aid and abet because only supervisors can create liability for an employer. As cases imposing liability for coworker harassment demonstrate, that statement of the law is erroneous. We also note that, under the LAD, "any person" may aid and abet; no ability to bind the employer is necessary. New Jersey may ultimately decide, contrary to our prediction, that harassment by a nonsupervisory employee can constitute aiding and abetting, in which case we would of course follow its interpretation of state law.

33. We note that the claims against the individual defendants are largely symbolic. Hurley's monetary recovery will come from the ACPD, and in practical terms the liability of the individual defendants is not that significant.

53